**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**In re SALE OF LAND AND FACILITIES TO the COMMONWEALTH OF MASSACHUSETTS,** Settlement with New Haven Trustee and Boston and Albany bondholders.

**No. Bky 70–347.**

United States District Court, E. D. Pennsylvania.

Aug. 8, 1972.

Motion for Stay Sept. 6, 1972.

Robert Blanchette, John F. DePodesta, Philadelphia, Pa., for Trustees, Penn Central Transp. Co.

Sullivan & Worcester by Joseph Auerback, Robert G. Bleakney, Jr., and Morris Raker, Boston, Mass., Gratz, Tate, Spiegel, Ervin & Ruthrauff, by Spencer Ervin, Jr., and Wilbur Bourne Ruthrauff, Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford RR.

Ballard, Spahr, Andrews & Ingersoll by Richardson Blair, Philadelphia, Pa., for Girard Trust Bank.

Fox, Rothschild, O'Brien & Frankel by Nochem S. Winnet, Philadelphia, Pa., for First Natl. City Bank of N. Y.

Davis, Polk & Wardwell by John R. Leekly, New York City, for Morgan Guaranty Trust Co. of N. Y. as indenture trustee.

Ballard, Spahr, Andrews & Ingersoll by Alan Fellheimer, Philadelphia, Pa., Liaison counsel for indenture Trustees.

Louis L. Waters, Asst. Corp. Counsel for City of New York.

Morgan, Lewis & Bockius by John N. Schaeffer, Jr., and Peter Koury, Philadelphia, Pa., for the Fidelity Bank.

Edward F. McLaughlin, New York City, for the trustees, Penn Central Transp. Co.

Duane, Morris & Heckscher by Henry T. Reath and Reeder R. Fox, Philadelphia, Pa., for New England Merchants Bank, indenture trustee for Boston & Albany RR.

Davis, Polk & Wardwell by Douglas M. Galin, and Dale L. Matschullat, New York City, for Bankers Trust Co., Mfg. Hanover Trust Co. and Morgan Guaranty Trust Co. of N. Y., as indenture trustees.

Joseph H. Elcock, Jr., Boston, Mass., for Mass. Bay Trans. Authority and Alan D. Altshuler, Secretary of Transportation, Comm. of Mass.

Joseph A. Blundon, Asst. Chief Counsel, Washington, D. C., for Urban Mass. Trans. Administration, U. S. Dept. of Transportation.

James J. Dausch, for United States Dept. of Justice.

David Berger and Gerald J. Rodos, Philadelphia, Pa., for Penn Central Co. and its shareholders.

Jerome E. Sharfman, Washington, D. C., for U. S. Dept. of Transportation.

Reeder R. Fox, Philadelphia, Pa., for Bankers Trust Co.

Morris R. Brooke and Andrew J. Valentine, for Amtrak.

Stern, Maxmin & Stern by I. Jerome Stern, Philadelphia, Pa., for Hans Jacobson, Heine & Co., John Tilney, and Walter Schloss Associates.

Drinker, Biddle & Reath by Patrick T. Ryan, Philadelphia, Pa., and Gaston, Snow, Motley & Holt by Arthur P. Schmidt, Gordon K. Bell and Stephen A. Moore, Boston, Mass., for The National Shawmut Bank of Boston, charge trustee.

## OPINION IN SUPPORT OF ORDER NOS. 867 and 868

FULLAM, District Judge.

The Trustees have filed a petition (Document No. 2725) for approval of a proposed sale of certain land and facilities to the Commonwealth of Massachusetts for a total price of $19.5 million. Included within the proposed sale are the following properties:

1. Approximately 50.65 miles of right-of-way, formerly the property of the reorganization trustee of the Boston and Providence Railroad Corporation (B & P), acquired by the Trustees pursuant to Order No. 215 in these proceedings;

2. Approximately 84.52 miles of right-of-way, formerly the property of the reorganization trustees of the New York, New Haven and Hartford Railroad Company (New Haven), acquired by the Debtor as the result of the inclusion of the New Haven in the merger between the New York Central and Pennsylvania Railroad Company (see New Haven Inclusion Cases, 399 U.S.

392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970));

3. Approximately 10.09 miles of right-of-way, formerly the property of the Boston and Albany Railroad, acquired by the Debtor's predecessor, the New York Central Railroad Company, through an earlier merger.

A hearing on the Trustees' petition was held on May 15, 1972. At the hearing, objections to the proposed sale were raised on behalf of the bondholders of the Boston and Albany Railroad, asserting that the proposed sale price was inadequate with respect to the former Boston and Albany property (item number 3 above); and the trustee of the New Haven reserved the right to challenge the adequacy of the price with respect to the former New Haven property (item number 2 above), in the event that a proposed settlement agreement then under discussion did not materialize.

Thereafter, further hearings were held, on June 12 and June 30, 1972, to consider (1) a proposed form of order approving the proposed sale (Document No. 3769); (2) the Trustees' petition for approval of a settlement agreement with the New Haven trustee (Document No. 3525); and (3) approval of a proposed settlement with the Boston and Albany bondholders, embraced within the form of order proposed by the Trustees.

If the proposed settlements with the Boston and Albany bondholders and the New Haven trustee, respectively, are approved, this would remove all objections to the proposed sale to the Commonwealth of Massachusetts. However, Morgan Guaranty Trust Company and a group of other indenture trustees object to the proposed settlements with Boston and Albany bondholders and the New Haven trustee, although they do not object to the underlying sale itself.

If the Boston and Albany settlement is approved, the Court will also be required to act upon the petition of New England Merchants National Bank, as indenture trustee of the Boston and Albany bonds, "for determination of procedure for partial payment of Boston and Albany 4¼% bonds due 1978" (Document No. 3770). And if the proposed settlement with the New Haven trustee is approved, the Court will be able to act finally upon the Trustees' earlier petition (Document No. 2258) seeking approval of the transfer of various highway bridges in Massachusetts to the Commonwealth of Massachusetts; and various other pending matters (certain aspects of the earlier sale of commuter lines to the Metropolitan Transit Authority and Connecticut Transportation Authority, and the Summer Street bridge transaction) will be resolved without further litigation.

## I. *The Merits of the Proposed Sale*

Determination of a fair price for the properties proposed to be conveyed is extremely difficult. Under the terms of the proposed conveyance, the purchaser would acquire fee title to the roadbed and appurtenances, including air rights, but the Debtor's estate would retain a permanent easement for rail operations. Thus, the uncertainties in evaluating the worth of the fee title to a rather narrow strip of land, much of it in rural and undeveloped areas, or below the grade of adjacent streets and highways, is compounded by the difficulty in evaluating the retained railroad easements. The property is, in reality, *sui generis*. Executives of the Debtor, experienced in such matters, are satisfied that the negotiated price is fair, and their judgment has been supported by the testimony of an independent appraiser.

There is no evidence in the record of any higher appraisal, but the Boston and Albany bondholders, through cross-examination and through the testimony of an expert appraiser whose qualifications are somewhat more impressive than those of the Trustees' expert, sought to impeach the validity of the Trustees' methods of appraisal. The principal thrust of this challenge involves a theo-

ry of "enhancement value" adopted by an arbitrator in certain condemnation proceedings involving somewhat similar property of the Boston and Maine Railroad. Under this approach, the aggregate of prices arrived at upon a per-square-foot or per-parcel basis would be substantially increased by multiplying an arbitrary factor to reflect the fact that the parcels have all been assembled and are being purchased as a unit, without the necessity of incurring the costs and risks of assemblage.

Whatever may be the merits of this challenge, as a matter of abstract theory, the following facts have been established without contradiction:

1. The proposed sale price was arrived at after many months of arms-length, aggressive bargaining;

2. There is no possibility that this purchaser will offer any higher price for the property;

3. No other purchaser has expressed interest in the property, and there is in reality no other market for the property; and

4. The proposed sale would not interfere with the continued operation of the Debtor's railroad.

It may well be that, if the property had been condemned, and the issue were the full and fair price which the condemnor should be required to pay, there might be considerable merit to the suggestion that the objectors' appraisal theory should be adopted. But the Commonwealth of Massachusetts has not condemned the property, and is under no obligation to purchase or pay for it. What is really involved here is the Trustees' business judgment that it would be better for the Debtor's estate to accept the present offer of $19.5 million for the fee title, retaining a permanent easement for rail operations, than to retain the asset in the present form of ownership. On the record before me, it is clear that the Trustees' judgment is sound and should be upheld.

## II. *Proposed Settlement with Boston and Albany Bondholders*

The Boston and Albany mortgage is a first lien upon approximately 284 miles of railroad right-of-way, with appurtenances. The proposed sale embraces 10.5 miles of this right-of-way, for which the proposed sale price is about $3 million. The total outstanding debt under the B & A mortgage indenture is approximately $5.7 million.

Under the proposed settlement agreement, the B & A bondholders would withdraw their objections to the proposed sale. Of the nearly $3 million sale price, $750,000 would be drawn down by the Trustees for (a) discharge of certain tax liens aggregating approximately $23,000; (b) pro rata share of expenses of sale; and (c) additions and betterments. The balance of approximately $2,150,000 would be paid to the indenture trustee in reduction of the mortgage debt.

It is clear that the proposed settlement is not unlawful. Section 77(*o*) of the Bankruptcy Act expressly provides, in connection with sales of property during the pendency of reorganization proceedings, "The judge may order the trustee or trustees of the debtor to deposit such proceeds with any mortgage trustee entitled thereto, to be applied in payment of all or part of such mortgage."

Since the Boston and Albany mortgage is the only mortgage constituting a lien on the 10.5 mile segment to be conveyed, payment of the funds to the indenture trustee in réduction of the mortgage debt, as opposed to retention of the fund subject to existing liens, would not prejudice the rights of any other creditor. The remaining property subject to the Boston and Albany mortgage is more than adequate security for the payment of administration claims, including trustees' certificates. And, while the claims represented by these bonds have not been formally proved, their validity seems unquestionable, and

the Trustees have the power to concede that fact.

Nevertheless, the proposed settlement would result in according to the B & A bondholders more favorable treatment than has been accorded other bondholders in cases of property sales. The B & A bondholders will be receiving now, in cash, part of what they will undoubtedly be entitled to receive in the final outcome of these reorganization proceedings. In exchange for this advantage of immediate payment, the Trustees will receive (a) immediate use of approximately $700,000 for additions and betterments; and (b) the remaining benefits of the proposed sale to the Commonwealth of Massachusetts. While the former benefit is not insignificant, it is apparent that the latter provides the principal incentive motivating the Trustees to propose the settlement agreement. It is apparent from the record that the Trustees are apprehensive that, irrespective of the merits of the objections to the sale interposed by the B & A bondholders, extensive litigation of these objections would be likely to frustrate the sale. Again, this is a matter of business judgment. Since the proposed settlement will not adversely affect the substantive rights of any other creditor, I have concluded, somewhat reluctantly, that the settlement agreement should be approved.

### III. *Proposed Settlement with the New Haven Trustee*

■ The proposed settlement with the New Haven trustee covers a wide variety of issues and transactions, which need here only be summarized:

The New Haven trustee objected to the sale of commuter lines to the MTA/CTA, covered by Orders Nos. 63 and 72 in these proceedings. The principal outstanding claim is the assertion that the New Haven trustee is entitled to receive certain rentals payable under that agreement, at the rate of $800,000 per year. Certain accumulated rentals, and proceeds from sales of rolling stock,

have been held in escrow pending resolution of the controversy. The New Haven trustee objected to the transfer of highway bridges in Massachusetts to the Commonwealth of Massachusetts, on the theory that such transfers would diminish the security for the New Haven's divisional mortgage. While it is unlikely that, if the New Haven trustee's position were sustained, the burden upon the Debtor's estate would be more than a requirement that some fairly modest amount of cash should be deposited as substitute security, the valuation process would be expensive and time consuming, whereas immediate consummation of the transfers would relieve the Debtor's estate of maintenance costs in excess of $100,000 per year, and would greatly reduce liability exposures.

In connection with the Summer Street bridge (Orders Nos. 179, 180 and 196), the New Haven trustee succeeded on appeal in establishing that this Court's previous allowance of substitute security was inadequate. *See* 458 F.2d 1030 (3d Cir., 1972). And finally, in connection with the proposed sale to the Commonwealth of Massachusetts, the New Haven trustee has reserved the right to present evidence to the effect that the proposed sale price of the former New Haven segment is inadequate.

Under the terms of the proposed settlement agreement, all of the above controversies would be resolved. The New Haven trustee would withdraw its objection to the proposed sale to the Commonwealth of Massachusetts, its objections to the transfer of the highway bridges, its objections and claims with respect to the MTA/CTA transaction, and its claims in connection with the Summer Street bridge transaction. From the proceeds of the sale to the Commonwealth of Massachusetts, $4.5 million would be paid to the New Haven trustee in reduction of debt (either the divisional first mortgage or, if ultimately so ordered by this Court, other priority secured claims of the New Haven trustee); and there would be an amicable

division of the accrued rents and certain future rents under the MTA/CTA agreement.

In the aggregate, the New Haven trustee would receive approximately $11 million, of which the appropriate amount would be credited on account of the principal of secured debt. The Debtor's estate would receive $5.2 million from the escrowed rentals and car sale proceeds of the MTA/CTA transaction; approximately $6.5 million from the proceeds of the sale to the Commonwealth of Massachusetts; and the unchallenged right to receive future rentals under the MTA/CTA agreement aggregating approximately $53.4 million over the term of that agreement. In addition, the Debtor's estate would secure the advantages of the transfer of the highway bridges, and would be relieved of all claims in connection with the Summer Street bridge transaction. The Trustees' rights with respect to additions and betterments on the New Haven properties would not be affected by the settlement. And, as in the case of the Boston and Albany settlement discussed above, consummation of the proposed settlement agreement, and the various transactions covered thereby, would not adversely affect allocation of the burden of administration expenses.

The settlement agreement outlined above is the result of extended negotiations conducted by able and experienced counsel. It has been submitted to and approved by the New Haven reorganization court. In my view, it represents an acceptable resolution of the many problems and controversies involved. Approval of the proposed settlement agreement does not reflect the expression of any view as to the merits of the various claims asserted. It is enough to note that none of the claims asserted can be said to be so totally lacking in merit as to be regarded as frivolous or sham; that it would obviously be in the best interests of the Debtor's estate to have all of these matters immediately and finally resolved; that the over-all effect of consummation of the settlement would pro-

duce substantial benefit to the Debtor's estate; and that no substantive rights of other creditors would be adversely affected thereby.

## VI. *Amtrak Problems*

The National Rail Passenger Corporation ("Amtrak") operates intercity passenger service, under contract with the Debtor, over many of the lines proposed to be sold. Obviously, the terms of the permanent easement being reserved by the Debtor must be broad enough to assure all concerned that Amtrak's future operations will not be adversely affected. Negotiations are under way to iron out any difficulties remaining in this respect. The form of order to be entered herein will provide the necessary protection to Amtrak interests.

For the reasons set forth above, the Trustees' applications will be approved, on the terms and conditions embodied in Orders Nos. 867 and 868.

## MOTION TO STAY ORDERS AUTHORIZING SETTLEMENTS

Certain indenture trustees have moved for a stay pending appeal of Order Nos. 867, 868 and 886, which authorized the sale of almost 100 miles of the Debtor's right-of-way to the Commonwealth of Massachusetts for $19.5 million and which at the same time approved settlements with the New Haven trustee and with the bondholders of the Boston and Albany Railroad. Under the settlement the B and A bondholders would receive $2.15 million to be applied in reduction of their claim of $5.7 million; in exchange, they give up the right to challenge the adequacy of the consideration for the sale of the property. In its settlement the New Haven trustee also gives up the right to challenge the adequacy of consideration for the sale, and also settles three other pending disputes with the Debtor's Trustees. Under the agreement the New Haven trustee will receive payments totalling $11 million by 1978 while the Debtor's estate will receive immediately $11.7 million plus payments of $400,000 per year for three years begin-

ning in 1975 and $800,000 per year thereafter for 53 years. I have concluded, for the reasons set forth in the Opinion in support of Order Nos. 867 and 868, that the sale and settlements are in the best interest of the Debtor's estate.

The agreements involved here were negotiated at length before their presentation to this Court. The agreements presented contained the condition that they would be effective only so long as the orders authorizing them had not been stayed. (This provision was inserted for understandable reasons: the purchaser of the property must consummate the transaction quickly, the Debtor's Trustees have a pressing need for the cash they will obtain, particularly after the recent disastrous floods and, no doubt, the value of the bargain to the New Haven trustee and to the B & A bondholders would have been substantially vitiated by the possibility of significant delays in receiving their money.)

Since the agreements contained this provision, a necessary foundation for authorizing the Trustees to proceed with the transactions was the finding that if the orders of authorization were later appealed and reversed, and, in the meantime, the transactions had been consummated, no irreparable injury would have been sustained by the appellants. By their present motion these indenture trustees are, in effect, applying for a reconsideration of that determination.

It can be argued that, if the transactions are consummated, irreparable injury might accrue to these indenture trustees in two ways. First, if administration expenses mount to the point where they equal or exceed the value of the assets of the estate, the B & A bondholders and the New Haven trustee will have received more than their share of the estate. However, I find this circumstance so highly improbable that it cannot form the basis for a finding of possible irreparable injury. This Court is clearly in a position to prevent such occurrence.

Even if the less extreme eventuality occurred, that administration expenses rose to the level that they partially consumed the security of secured parties, it is difficult to envision how the parties to the settlement agreement will have been preferred. The remaining security for the B & A bonds and for the New Haven's claims is very large. Expenses of administration would have to approach total consumption of the estate before the value of the property left to secure the claims of these two parties dropped below the amounts to be paid out to them now. Thus, irreparable injury cannot be found in this hypothesis either.

A more persuasive argument for a finding that irreparable harm might occur is that by interim consumption of these transactions the B & A bondholders and the New Haven trustee will have been put in a more favorable position vis-à-vis other secured creditors because they will have had present use of money to which they are entitled while the other creditors will have to wait a substantial period of time before they get the money to which they are entitled. It is pointed out, for example, that the B & A bondholders would be entitled to only $4\frac{1}{2}\%$ interest on their bonds in a plan of reorganization, whereas they could no doubt obtain a higher return in the present money market.

However, assuming that the parts of the orders authorizing a settlement are reversed, this benefit is one that could easily be rescinded. Both parties still have secured claims against the estate which are larger than the amounts they will now receive. If it is later held that these parties should not have received any payment now, the benefits they will have received are quantifiable, and appropriate adjustments may be made in the treatment of these parties in whatever plan is ultimately to be carried out, so as to put them on an economic par with other creditors. For the foregoing reasons, I have concluded that the settlement agreements may be consummated without the possibility of irreparable harm occurring to the moving

parties and, therefore, the motion for a stay will be denied.

It bears emphasis that neither the present movants nor any other interested party challenges the desirability of the underlying sale of assets. The immediate effectuation of the settlement agreements is a condition precedent to the validity of this Court's approval of the sale. To stay the order approving the settlement agreements would jeopardize a transaction which all agree is in the best interests of the estate, and would probably moot the very appeals movants seek to pursue; whereas denial of the requested stay would fully preserve their rights for meaningful appellate review, with no genuine possibility of irreparable harm.